## UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

IGUANAMED IP, LLC,

                Plaintiff,

v.

UNIFORMEDI, LLC,

                Defendant.

**JURY TRIAL DEMANDED**

Civil Action No. 8:19 cv 2236T 30 TGW

### COMPLAINT

Plaintiff, IGUANAMED IP, LLC, ("Plaintiff" or "IguanaMed"), sues Defendant, UNIFORMEDI, LLC and alleges:

### NATURE OF THE ACTION

1.     This Complaint alleges that Defendant, a scrubs retailer, sold confusingly similar knock-offs of Plaintiff's scrubs and thereby infringed Plaintiff's rights in and to its highly distinctive Trade Dress (defined below), in violation of Section 43(a)(1)(A) of the Lanham Act's prohibition against false designations of origin, sponsorship or approval.

### PARTIES

2.     Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware.

3.     Defendant is a limited liability company organized and existing under the laws of the State of Florida.

### JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); and, 28 U.S.C. § 1338 (patents, copyrights, trademarks and unfair competition).

1

5.     This Court has personal jurisdiction over Defendant because Defendant committed the tortious conduct alleged in this Complaint in this State; indeed, Defendant sold a substantial amount of infringing goods in this State.  Additionally, Defendant has engaged in substantial and not isolated business activity in this State.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant is subject to the Court's personal jurisdiction with respect to this action.

## GENERAL ALLEGATIONS

### A.  IGUANAMED IP, LLC and its Trade Dress

7.     From 2005 through early 2019, IguanaMed, LLC was operating under the trademark IguanaMed.  However, prior to its name change in 2014, its legal name was Walrus Brands, LLC.  To make the distinction from Plaintiff, IguanaMed IP, easier IguanaMed, LLC will be referred to as "Walrus."

8.     From 2005 through early 2019, Walrus was an established, widely recognized and popular manufacturer, wholesale seller and designer of medical apparel, particularly scrubs.

9.     Walrus assigned all of its intellectual property rights to Plaintiff, including the at-issue Trade Dress, the goodwill associated therewith, and the right to sue for the past, present and future infringement thereof.

10.     Plaintiff and Walrus are both wholly owned by the same family.

11.     Currently, Plaintiff intends on licensing the Trade Dress to a third party manufacturer for purposes of allowing that manufacturer to sell scrubs bearing the Trade Dress.

12.     Walrus designed all of the scrubs it sold, as well as the trade dress associated with its scrubs.

13.     Until 2019, Walrus had been marketing and selling scrubs bearing a unique trade dress, as further described herein, and referred to herein as the "Trade Dress".

14.     Sales of the Trade Dress protected scrubs caused Walrus to become the fastest growing apparel company in the United States.

15.     The Trade Dress protected scrubs were significantly more fashionable than scrubs sold prior to 2006.

16.     The fashion forward nature of the Trade Dress scrubs was revolutionary; the scrubs are not boxy or overly decorated but instead cut to fit, trendy and stylish.

17.     Walrus had made extensive and continuous use of the Trade Dress throughout the United States prior to the time Peaches (identified and defined below) and Defendant commenced selling knockoff, infringing scrubs, bearing Plaintiff's distinctive Trade Dress.

18.     Walrus extensively advertised Plaintiff's Trade Dress through a wide range of media, including, but not limited to, magazines, billboards, radio, the internet, catalogs and at trade shows.

19.     Prior to the time Peaches and Defendant began selling the at-issue knock off scrubs which contain the infringing Trade Dress, by virtue of Walrus's extensive investment, advertising and promotion, peer to peer advertising, and third party media, Plaintiff's Trade Dress had become widely known and was immediately recognizable to consumers throughout the United States, as emanating from one source.

20.     Put another way, the Trade Dress had acquired a distinctiveness and a secondary meaning in the minds of consumers as an identifier of scrubs that emanate from one source or origin prior to the commencement of Peaches and Defendant's infringement.

3

B.  **THE DEFENDANT AND ITS RELATIONSHIP TO PEACHES**

21.     Defendant is a retailer that buys its goods from manufacturers for purposes of reselling them to the public.

22.     The knockoff scrubs were originally sold to Defendant by MedCouture, Inc.

23.     MedCouture, Inc. was formerly known as Peaches, Inc.

24.     Throughout this Complaint, the company now known as MedCouture, Inc. is referred to by its former name "Peaches."

C.  **The Elements of the Trade Dress**

25.     As used in this Complaint, "Trade Dress" refers to one, more or all of the trade dresses described in paragraphs 25-26.

26.     Plaintiff's scrub top bearing Style 5400, as depicted below, contains distinctive trade dress comprised of:

> **Style 5400**
>
> - A short-sleeve, buttonless, pullover style scrub sold under the mark Classic Scrub Top.
> - Angled right and left hand pockets placed on bottom front of garment
> - Silver tab placed on top center of right sleeve.
> - A chest Velcro pocket with badge holder and stylized logo.
> - A v-neck with a contrasting back neck line and overlap on left hand side.
> - Extra pockets placed inside garment.
> - White sticker containing stylized logo and the words "YO! POCKETS INSIDE" placed on left lower front, advertising extra pockets placed inside garment.
> - Contrasting aesthetic and distinctive color stitching placed on underarm of sleeves, left and right sides of chest and front pockets, pen holder in chest pocket, and tops of side slits on bottom of garment.
> - Contrasting aesthetic and distinctive border at back of neck containing stylized logo.
> - MED FLEX brand stretch fabric.

4

27.     Plaintiff's scrub pant bearing Styles 5300 and 5500, as depicted below, contains a distinctive trade dress comprised of:

### Style 5300

- Flat front, straight leg, drawstring top pants.
- Contrasting stylized logo placed on top of one of the pant legs.
- Contrasting aesthetic and distinctive color drawstrings.
- Inside back elastic pager clip.
- Contrasting color logo placed on the inside top center of pants.
- Contrasting color logo placed near top of back pocket.
- MED FLEX brand stretch fabric.

### Style 5500

- Flat front, boot cut, drawstring top pants.
- Contrasting aesthetic and distinctive color drawstrings containing embossed, stylized logo repeated along length of drawstring.
- Contrasting stylized logo placed on top front of left leg.
- Inside of boot cut lined in aesthetic and distinctive contrasting color.
- Outside of boot cut lined in aesthetic and distinctive color stitching.
- MED FLEX brand stretch fabric.

**D.  Peaches Copying and Its Motivation Therefore**

28.     Peaches manufactures, distributes, sells and/or offers to sell uniforms and scrubs.

29.     Shortly after launching the Trade Dress scrubs, Walrus quickly took market share from competitors, including Peaches.

30.     From 2007-2009, Peaches was a large but rapidly declining company.  At that time, it was primarily selling overly decorated and boxy scrubs.

31.     Peaches sales representatives admitted to being envious of Walrus's fashion forward design.

32.     Going back to the very beginning of Peaches' founder and owner's career, Peaches founder and owner has had a history of copying other fashion designer's work.

33.     After seeing the success of Walrus's scrubs, Peaches created an entire line of scrubs under a new brand called "Med Couture" which copied and imitated Walrus's scrubs.

34.     Prior to the launch of the Med Couture brand, Peaches had focused on manufacturing scrubs with substantial patterns that otherwise bore no resemblance to Walrus's Trade Dress protected scrubs.

35.     Seeking to capitalize on the success of Walrus's scrubs, Peaches intentionally copied Walrus's Trade Dress and produced virtually identical knockoffs of Walrus's scrubs.

36.     Peaches' designer placed Walrus's scrubs on her design table, measured them, and copied all of the Trade Dress elements.

37.     Thereafter, Peaches' designer merely sent the sketches off to an overseas third party manufacturer for production.

38.     Peaches' infringing products were intentionally designed to imitate, copy and be nearly indistinguishable from Walrus's scrubs and Plaintiff's Trade Dress.

39.     As depicted below, Peaches copied virtually every element of Walrus's Trade Dress.

>    a. **Peaches scrub top bearing Style 8403 infringes Walrus's scrub top bearing Style 5400:**

| Walrus's Style 5400 Scrub Top | Peaches' Style 8403 Infringing Scrub Top |
|---|---|



| | |
|---|---|
| A short-sleeve, buttonless, pullover style scrub sold under the mark "Classic Scrub Top." <br><br> Angled right and left hand pockets placed on bottom front of garment. | A short-sleeve, buttonless, pullover style scrub sold under the mark "Classic Scrub Top." <br><br> Angled right and left hand pockets placed on bottom front of garment. |
|  |  |
| Silver tab placed on top center of right sleeve. | Silver tab placed on top center of right sleeve. |
|  |  |
| A chest Velcro pocket with badge holder and stylized logo. | A chest Velcro pocket with badge holder and stylized logo. |
|  |  |
| A v-neck with a contrasting back neck line and overlap on left hand side. | A v-neck with a contrasting back neck line and overlap on left hand side. |

 

| | |
|---|---|
| Extra pockets placed inside garment.

White sticker containing stylized logo and the words "YO! POCKETS INSIDE" placed on left lower front advertising extra pockets placed inside garment. | Extra pockets placed inside garment.

White sticker containing stylized logo and the words "LOOK! Extra pockets inside" placed on left lower front advertising extra pockets placed inside garment. |

 

| | |
|---|---|
| Contrasting aesthetic and distinctive color stitching placed on underarm of sleeves, left and right sides of chest and front pockets, pen holder in chest pocket, and tops of side slits on bottom of garment. | Contrasting aesthetic and distinctive color stitching placed on underarm of sleeves, left and right sides of chest and front pockets, pen holder in chest pocket, and tops of side slits on bottom of garment. |

 

| | |
|---|---|
| Contrasting aesthetic and distinctive border at | Contrasting aesthetic and distinctive border at back |

| back of neck containing stylized logo. | of neck containing stylized logo. |
|---|---|
|  | |
| MED FLEX brand stretch fabric. | EZ-FLEX brand stretch fabric. |

    **b. Peaches' scrub pant bearing Style 8705 infringes Walrus's scrub pant bearing Styles 5300 and 5500:**

| Walrus's Scrub Pants Style 5300 | Peaches' Infringing Scrub Pants Style 8705 |
|---|---|
|  | |
| Flat front, straight leg, drawstring top pants. | Flat front, straight leg, drawstring top pants. |

| Contrasting stylized logo placed on top front of one of the pant legs. | Contrasting stylized logo placed on top of one of the pant legs. |
|---|---|
|  |  |
| Contrasting aesthetic and distinctive color drawstrings. | Contrasting aesthetic and distinctive color drawstrings. |
|  |  |
| Inside back elastic pager clip. | Inside back elastic pager clip. |
|  |  |
| Contrasting color logo placed on the inside top center of pants. | Contrasting color logo placed on the inside top center of pants. |



Contrasting color logo placed near top of back pocket.



Contrasting color logo placed near top of back pocket.



MED FLEX brand stretch fabric.



EZ-FLEX brand stretch fabric.

c. **Peaches' scrub pant bearing Style 8705 infringes Walrus's scrub pant bearing Styles 5300 and 5500:**

| IguanaMed Classic Scrub Pant Style 5500 | Peaches' Classic Scrub Pant Style 8705 |
|---|---|
|  |  |
| Flat front, boot cut, drawstring top pants.<br><br>Contrasting aesthetic and distinctive color drawstrings containing embossed, stylized logo repeated along length of drawstring.<br><br>Contrasting stylized logo placed on top of one of the pant legs. | Flat front, boot cut, drawstring top pants.<br><br>Contrasting aesthetic and distinctive color drawstrings containing embossed, stylized logo repeated along length of drawstring.<br><br>Contrasting stylized logo placed on top of one of the pant legs. |
|  |  |
| Inside of boot cut lined in aesthetic and distinctive contrasting color. | Inside of boot cut lined in aesthetic and distinctive contrasting color. |

 

| Outside of boot cut lined in aesthetic and distinctive contrasting color stitching. | Outside of boot cut lined in aesthetic and distinctive contrasting color stitching. |
| --- | --- |

 

| MED FLEX brand stretch fabric. | EZ-FLEX brand stretch fabric. |
| --- | --- |

40.     The striking similarities between Plaintiff and Peaches' trade dress, including its most salient aesthetic and distinctive elements, make clear that Peaches intentionally copied the Trade Dress in a conscious and deliberate attempt to trade off the goodwill associated with it.

41.     In addition to copying the aesthetic features and Trade Dress, Peaches copied Walrus's color combinations. For example:

Walrus: Newport Navy
Peaches: New Navy

<u>Walrus:</u> Vintage Olive
<u>Peaches:</u> Olive

<u>Walrus</u>: Carbon Black
<u>Peaches</u>: Charcoal

<u>Walrus:</u> Newport Navy with Iguana Green Trim
<u>Peaches:</u> Navy with [Green] Apple Trim

<u>Walrus:</u> Vintage Olive with Purple Blaze Trim
<u>Peaches</u>: Olive with Boysenberrry Trim  [i.e., close to same shade of purple]

<u>Walrus:</u> Wine with Carmine Pink Trim
<u>Peaches:</u> Wine with Powder Pink Trim

<u>Walrus:</u> Winter White with White Trim
<u>Peaches</u>: White with White Trim

<u>Walrus:</u> Ceil Blue with Newport Navy Trim
<u>Peaches:</u> Ceil Blue with New Navy Trim

<u>Walrus:</u> Macintosh Red with Eclipse Black Trim
<u>Peaches:</u> Cherry with Black Trim

<u>Walrus:</u> Powder Pink and Bora Blue
<u>Peaches:</u> Power Pink Bora Pink

42.     Pictures of the scrubs showing the same base and trim color, along with all of the
identical detailed bartaking placed in the exact same locations follow:

A.  Plaintiff's scrubs:

Here are additional colors of **scrub S**.

(If you move your cursor over each photo it will make it larger. If using an iPad or tablet, simply touch each photo to make it larger.)



Remember, these are all photos of **scrub S**.

*Are you done? Click on the Next button.*

B.  Peaches' knock off scrubs:

Here are additional colors of **scrub R**.

(If you move your cursor over each photo it will make it larger. If using an iPad or tablet, simply touch each photo to make it larger.)



Remember, these are all photos of **scrub R**.

15

43.     Additionally, Peaches copied Walrus's advertisements, catalog cover, and advertising slogans, and point of sale advertisements which only increased the likelihood of confusion.

44.     Peaches assigned its knockoff and infringing scrubs style numbers 8403 and 8705 (nearly identical color versions) and 8466 and 8705 (neon versions).

**E.     Defendant's Infringement**

45.     By selling Peaches style numbers 8403, 8705, 8466 and 8705, and other colorable imitations containing the elements of the Trade Dress sold under different style numbers, all of which were produced by Peaches, Defendant infringed Plaintiff's Trade Dress.

46.     Walrus suffered *such* substantial damages from the infringement discussed herein (both Peaches and Defendant's infringement) that Walrus had to cease operations and is in the process of winding up.

47.     Peaches' infringement diverted approximately fifty million dollars worth of sales from Walrus to Peaches.

48.     Defendant's infringement diverted a substantial amount of sales from Walrus.

**F. Likelihood of Confusion**

49.     Consumers of the scrubs are likely to become confused within the meaning of Section 43(a) of the Lanham Act because:

(a)     they are likely to erroneously assume that Plaintiff and Peaches are connected or affiliated with each other or to erroneously assume that one sponsors or endorses the other party's sale of scrubs bearing the Trade Dress;

(b)     they are likely to erroneously assume that the  scrubs come from the same source or origin when in fact the scrubs come from two different sources and origins;

(c)     Consumers are likely to assume Walrus's scrub originates from Peaches, or vice versa.

50.     Defendant sold both Plaintiff and Peaches' scrubs at its retail scrubs store.

51.     Medical professionals comprise the bulk of the parties' customers, and as a community of people are likely to interact with and see each other.

52.     The cost of the scrubs is not so high that it warrants a studied purchase by medical professionals. Consequently, medical professionals are not very likely to seek out and notice minor differences between Plaintiff and Peaches' scrubs.

53.     Confusion is likely to occur both at the point of sale when a medical professional purchases scrubs, and when a medical professional is seen or sees other medical professionals wearing the scrubs.

54.     Both Walrus and Peaches sold their scrubs through the same channels of distribution.

55.     Both Walrus and Peaches marketed their scrubs through the same channels, e.g., at medical apparel conventions, using print and internet advertisements, directly to brick and mortar stores, and directly to end consumers and retailers over the internet.

56.     Peaches marketed and sold its infringing scrubs in the exact same geographic territory as does Walrus.

57.     Consumers and retailers have already become confused as to the source or origin of the parties' products.  Indeed, Plaintiff has evidence of actual confusion not only in the form of testimony from witnesses but also, among others, as follows:

- a Purchase Order showing a retailer attempted to order style 8655 from Walrus. Significantly, style 8655 is a style sold Peaches.

- An email directed to Walrus about flawed dye in Peaches's scrubs.

- An eBay listing purporting to be selling an "iguana med scrub set" but the scrub top that is for sale is actually from Peaches.

- An eBay listing purporting to be selling a "New Women's scrub top by IguanaMed Size Large" but the scrub top is actually Peaches' scrub.

- An eBay listing purporting to be selling a "MedCouture Peaches Scrub SZ Small" but it is actually selling Walrus's scrub.

- An eBay listing purporting to be selling "Iguana Med scrub set both large L@@k" but it is actually selling Defendant's MedCouture scrubs.

- An eBay listing purporting to be selling a Charcoal Iguana Med Set XS 8403 Top, Small Regular 8704 Pants Pale Pink Trim but it is actually selling Peaches' scrubs.

- An eBay listing purporting to be selling an XL Petite Royal With Aqua Trim Iguana Med Scrub Pants but it is actually selling Peaches' scrub pant.

- A print out of the Amazon webpage from the search results for "Iguana Med," stating that the "Brand" is Peaches' "Med Couture", thus evincing that Amazon thought Med Couture was a brand from IguanaMed.

- Another subsequent print out of an Amazon webpage from the search results for "IguanaMed" stating the MedCouture and Iguanamed are "related."

- A Tweet from a consumer who wrote #iguanascrubs (and three thumbs up emoji's) "Wearing one of my fav scrubs today, #iguana (three thumbs up emoji's) but she was actually wearing one of Peaches' scrubs

58.     The evidence of actual confusion not only acts as the best evidence of a likelihood of confusion but also demonstrates that the Trade Dress had established secondary meaning.

59.     Prior to this litigation, an expert, retained by Walrus, performed two surveys to assess whether there was a likelihood of confusion and secondary meaning.  Controls were used and the surveys were conducted according to highest standards of survey experts.

60.     Both surveys, which had very nearly the same results, showed a "*very high rate*" of actual confusion in excess of twenty-five (25%) percent.

61.     The surveys also evince a very high rate of secondary meaning.

62.     When mistakenly answering that one company put out both Peaches' and Walrus's scrubs, respondents, by way of example only, because there are many similar responses, answered: (1) "[t]he design looks the same;" and (2) "identical design and accent colors."

63.     And, in response to the question did one company get permission from the other to put out the scrub, the respondents provided answers such as (a) "too similar to the other and if they didn't get permission they could be sued; (b) "usually that is the business ethic followed."

64.     Peaches saturated the market with the infringing products.  As a consequence, both forward confusion, where people believe that Peaches' products come from Walrus's products and reverse confusion, where people believe that Walrus's products comes from Peaches' products exists in the marketplace.

65.     Defendant knew or should have known, or negligently failed to appreciate, that selling both the Trade Dress scrubs and the knock-off scrubs was likely to cause confusion.

**G.  The Trade Dress Is Not Legally Functional**

66.     Prior to this litigation, after an extensive analysis, an expert opined:

The Trade Dress is not functional because:

   a.   there are a variety of alternative designs available to competitors. . .;

   b.   there is no patent disclosing the practical advantages of Walrus's trade dress. . .;

19

c.  Walrus has not promoted the practical advantages of the overall trade dress;

d.  the trade dress does not result from a comparatively simple, cheaper, or superior method of manufacturing scrubs; instead it costs more to manufacture this trade dress as opposed to other variations of scrubs; and

e.  the exclusive use of the designs would not put competitors at any disadvantage.

**H.  Miscellaneous, Conditions Precedent and Attorney's Fees**

67.     From 2013 to 2019, Walrus and Peaches litigated Walrus's infringement claim against Peaches.

68.     That case resolved via a confidential settlement agreement.

69.     Plaintiff is not a party to any agreement that would prohibit it from suing Defendant.

70.     Defendant earned a significant amount of profits from its sales of the knock off scrubs.

71.     All conditions precedent to the institution, maintenance and prosecution of this action have occurred, have been performed or have otherwise been waived.

72.     Plaintiff has retained undersigned counsel to represent it in this matter, and is obligated to pay its counsel a reasonable fee for its services.  Plaintiff is entitled to recover the attorneys' fees and costs it incurs in this matter pursuant to 15 U.S.C. § 1117.

**COUNT I**
**False Designation of Origin**
**In Violation of 15 U.S.C. § 1125**

73.     The allegations contained in paragraphs 1 through 72 are hereby re-alleged as if fully set forth herein.

74.     Plaintiff Trade Dress had acquired a secondary meaning (aka distinctiveness) prior to the commencement of sales of scrubs bearing the infringing Trade Dress.

20

75.     Plaintiff's Trade Dress is comprised of a combination of elements placed at certain locations on a scrub.

76.     Plaintiff's Trade Dress is not legally functional.

77.     The scrubs Defendant sold copy and imitate every element of Walrus's Trade Dress.

78.     Defendant's unauthorized sales of infringing scrubs and its commercial advertising and promotion of them was done "in commerce" within the meaning of the Lanham Act.

79.     Defendant's sales and offers to sell infringing scrubs constitute a false designation of origin, or a false or misleading description or representation of fact, which is likely to cause confusion, mistake or deceive consumers, all as more specifically set forth in the factual background section.

80.     The infringement by Defendant has resulted in gains, profits and advantages to Defendant.

81.     Plaintiff does not have an adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant:

A.     Permanently enjoining Defendant from, directly or indirectly, importing, exporting, distributing, manufacturing, promoting, advertising, selling or offering for sale, any product or service using a trade dress that is confusingly similar to the Trade Dress;

B.     Ordering Defendant to turn over to Plaintiff all goods, labels, signs, prints, packages, wrappers, receptacles, documents, advertisements, letterhead, business cards or other promotional materials in its possession or under its control bearing a trade dress that is confusingly similar to the Trade Dress;

C.       Ordering that an accounting be made of the profits that Defendant has wrongfully obtained from its use and sales of the infringing scrubs;

D.       Awarding Plaintiff the profits Defendant made from the infringement pursuant to 15 U.S.C. § 1117(a)(1);

E.       Awarding Plaintiff damages under 15 U.S.C. § 1117(a)(2);

F.       Awarding Plaintiff three times its actual damages and Defendant's profits, enhanced as the Court deems just, under 15 U.S.C. § 1117(a)(3).

G.       Awarding Plaintiff its attorneys' fees and costs incurred in this action as an exceptional case under 15 U.S.C. § 1117(a)(3);

H.       Granting Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**LIPSCOMB & PARTNERS, PLLC**

By: /s/ Angela M. Lipscomb
Angela M. Lipscomb
Florida Bar No. 31111
al@lipscombpartners.com
Phone: (786) 431-2228
Fax: (786) 431-2229
127 W. Fairbanks Ave., Ste. 483
Winter Park, FL 32789
*Attorney for Plaintiff, IguanaMed IP, LLC*